UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DS, AN INFANT, BY AND THROUGH
HER PARENT AND NATURAL
GUARDIAN CS, AND CS,
INDIVIDUALLY, ON HER OWN
BEHALF,

                         Plaintiffs,

      v.

ROCHESTER CITY SCHOOL
DISTRICT, BOARD OF EDUCATION
OF THE ROCHESTER CITY SCHOOL
DISTRICT, et al.,

                     Defendants.

REPORT AND RECOMMENDATION
AND DECISION AND ORDER

19-CV-6528-EAW-MJP

**Pedersen, M.J.** Presently before the Court is a motion by Plaintiff DS, an infant, by and through her parent and natural guardian CS, and Plaintiff CS, individually, on her own behalf ("Plaintiffs"), for leave to amend the complaint and add other parties as individual capacity defendants pursuant to Rule 15(a) of the Federal Rules of Civil Procedure ("Fed. R. Civ. P") and Local Rule of Civil Procedure ("Loc. R. Civ. P.") 15. (Not. of Mot., Dec. 2, 2022, ECF No. 93.) The proposed amended complaint adds further allegations regarding Plaintiffs' claims of deliberate indifference to race-based bullying and First Amendment retaliation that allegedly occurred after the return of in-person instruction at Rochester City School #58. (*Id.*) For the reason stated below, the undersigned recommends that the District Court dismiss Plaintiffs' § 1983 claims against individual defendants in their official capacity; dismiss the Equal Protection claim asserted against Kwame Donko-Hanson;

and dismiss the claim for Due Process against Kwame Donko-Hanson.

The Court further grants Plaintiffs leave to amend their complaint with respect to the remaining claims and additional Defendants. Finally, the undersigned directs Plaintiffs to effect personal service in accordance with Fed. R. Civ. P. 4 for each of the newly-added Defendants.

## FACTUAL BACKGROUND

The undersigned takes the following facts from the proposed second amended complaint. (Pls.' Proposed Am. Compl., ECF No. 93-3.) The Court has recounted the factual background of this case in detail numerous times, and familiarity with it is assumed for purposes of this Report and Recommendation and Decision and Order. Nonetheless, the Court will briefly review the key facts below and include relevant factual additions from the proposed amended complaint.

### *Third Grade*

At the age of eight, DS began attending the third grade at School #58 in the Fall of 2016. (*Id.* ¶ 38.) Rochester City School District ("RSCD") responded to a FOIL request that showed the ratio of "black" and "Hispanic" students to white students in DS's third, fourth, and fifth grade classes was approximately seven to one. (*Id.* ¶ 41.) This made DS a minority student at School #58. (*Id.*) Sometime before the 2016 presidential election, DS's third grade teacher, Ms. Jessica Flanders, conducted a mock election with her students to see for whom they would vote. (*Id.* ¶ 43.) DS participated in the mock election and voted for Donald Trump while her "black" and "Hispanic" classmates voted for Hilary Clinton. (*Id.* ¶ 44.) After Donald Trump was elected President, Ms. Flanders orchestrated a "morning circle" so the students could

discuss their feelings about the election. (*Id.* ¶ 45.) At this time, DS's classmates became aware that DS had voted for Donald Trump and proceeded to allegedly call her a racist and her mom, CS, a racist. (*Id.* ¶ 47.) DS began to cry because of the accusations and complained to Ms. Flanders, but Ms. Flanders did nothing to stop the name calling. (*Id.* ¶¶ 51–52.)

As a result of the mock election, DS alleges that she became a target and was mistreated by her teacher as well as her "black" and "Hispanic" classmates. (*Id.* ¶ 57.) DS alleges that she was regularly called a racist, along with several other offensive names, and was denied participation in classroom activities. (*Id.* ¶¶ 58–60.) Ms. Flanders disciplined DS, which resulted in her "black" and "Hispanic" classmates laughing at her. (*Id.* ¶ 68.) CS attempted to discuss the disparate treatment incidents involving her daughter with Principal Sheela Webster, but Principal Webster refused to discuss the issues and did not require Ms. Flanders to meet with CS. (*Id.* ¶¶ 83, 84.)

DS eventually moved to a different third grade classroom. (*Id.* ¶ 88.) DS began to be harassed and bullied in her new class primarily by a student, JL. (*Id.*) Principal Webster continued to fail to effectively stop the harassment. (*Id.* ¶ 97.) By the end of the third grade, it is alleged that there had been 19 acts of harassment and bullying directed at DS by her "black" and "Hispanic" classmates. (*Id.* ¶ 100.)

***Fourth Grade***

The bullying and discrimination continued into fourth grade. (*Id.* ¶ 104.) DS and JL were still in the same class, and JL continued the physical and verbal abuse by repeatedly pushing and kicking DS and directing inappropriate phrases at her.

3

(*Id.* ¶¶ 105, 108, 112.) As a result of the continued bullying, DS became more and more isolated and her performance in school declined, as well as her ability to remember simple tasks. (*Id.* ¶ 116.) On April 27, 2018, more than a year from when CS advised School #58 of JL's aggressive bullying of DS, CS received an email from Idonia Owens, Chief of Schools for Equity, outlining a safety plan for DS that stated she could call her mom whenever she felt like she was in distress. (*Id.* ¶ 140.) On May 16, 2018, after the safety plan had been established, JL kicked DS in the right ankle twice. (*Id.* ¶ 153.) Principal Webster was among a list of staff members who precluded DS from calling her mother, nor did she report the incident to CS. (*Id.* ¶¶ 154, 156.)

On June 19, 2018, Plaintiffs hired Dr. Daniel J. DeMarle to conduct an evaluation on DS to determine whether the bullying she was suffering caused her to not progress in school as expected for a healthy child. (*Id.* ¶ 213.) Dr. DeMarle determined that DS's disabilities resulted in part because of the bullying, harassment, and physical abuse that DS was experiencing at school. (*Id.* ¶ 216.) However, after conducting its own testing of DS, RCSD determined DS was not in need of special education services and allegedly refused to provide her with them. (*Id.* ¶¶ 217–18.) School #58 eventually made an accommodation plan ("Section 504 Plan") pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794(a). (*Id.* ¶ 220.) The Section 504 Plan allowed DS to go to a "safe place" (such as the Nurse's Office or a Safe Zone) or call her mom. (*Id.* ¶ 223.) However, it is alleged that the right to go to a safe place or call her mom was often denied by the staff at School #58 based on DS's skin color. (*Id.* ¶ 224.)

4

*Fifth Grade*

DS continued to be verbally and physically harassed by her fifth grade classmates because of her race. (*Id.* ¶¶ 225–26.) On September 25, 2018, CS attended a meeting at School #58 with the parents of DS's "black" and "Hispanic" classmates and Principal Webster, Vice Principal Charles Smith, and Parent Liaison Shelly Boyd. (*Id.* ¶¶ 255–56.) During the meeting, CS was accused of being a racist and raising a racist family. (*Id.* ¶ 259.) On October 9, 2018, a "black" classmate threatened to whip DS to death, and on the following day, another "black" classmate found a hammer and told DS that he was "going to murder [her] with [it]." (*Id.* ¶¶ 276, 279.) CS attempted to file a Dignity for All Students Act ("DASA[1]") report relating to incidents that occurred on September 21, 24, and 25, but, to the best of CS's knowledge, no DASA report was made. (*Id.* ¶¶ 286–87.) On November 8, 2018, CS wrote an email to the school's DASA coordinator, Mr. Smith,[2] informing him that in 44 days of school there had allegedly been 20 incidents of bullying, harassment, and intimidation towards DS. (*Id.* ¶ 299.)

After November 8, 2018, the bullying and harassment persisted. DS alleged that her classmate "S" attacked her in the bathroom stall. (*Id.* ¶¶ 314–15.) As a result

---

[1] According to Plaintiffs' complaint, the Dignity for All Students Act requires public schools to take prompt action to: end any harassment, bullying, and/or discrimination; provide a safe and supportive learning environment; and develop policies that enable students and persons in parental relation to make a report of harassment, bullying, and discrimination. (*Id.* ¶¶ 16–18.) This is not an exhaustive list of what DASA requires.

[2] Mr. Smith, referenced here, and Vice Principal Charles Smith are the same person. Mr. Smith was the Vice Principal, and at a certain point, he changed positions and became the school's DASA Coordinator.

of the bathroom incident, DS was given in school suspension without the mandated notice and explanation of DS's violation of the RCSD Code of Conduct. (*Id.* ¶ 316.) A few days after the bathroom incident, DS was participating in a Black Lives Matter assignment and coloring a women's face black. (*Id.* ¶ 319.) DS's teacher, Amy Martin, allegedly called DS a racist in front of other children because of the way DS was coloring the picture. (*Id.* ¶ 321.) DS told Valerie Torregrossa[3] about Ms. Martin calling her a racist but nothing came of it and several staff members refused to write a DASA report – Assistant Principal Kwame Donko-Hanson being one of them.[4] (*Id.* ¶ 326.) On September 24, 2017, Principal Webster directed the word "racist" towards DS and said that a hair pulling incident with another student, S, was because of DS's racism. (*Id.* ¶ 347.)

***Sixth Grade***

School #58 went to remote learning due to the Covid-19 Pandemic on or about March 16, 2020. (*Id.* ¶ 371.) Before that, School #58's new Principal, T'Hani Pantoja, and new Assistant Principal, Adrienne Steflik, were successful at subduing the race-based bullying of DS by her "black" and "brown" classmates. (*Id.* ¶ 370.)

***Eighth Grade[5]***

In September 2021, School #58 returned to in-person learning and there was a

---

[3] Valerie Torregrossa is an employee of the Center for Youth Services who worked at School #58 in the "Help Zone." (Pls.' Proposed Am. Compl. ¶ 26, ECF No. 93-3.)

[4] At the time, Donko-Hanson was Assistant Principal. When DS started eighth grade, Donko-Hanson was promoted to Principal of School #58. (*Id.* ¶ 374.)

[5] School #58 conducted Seventh grade entirely online due to the Covid-19 Pandemic. (*Id.* ¶ 372.) Principal Pantojah promptly intervened to stop any race-based bullying of DS

new Principal, Kwame Donko-Hanson, a new Vice Principal, Nyree Wims-Hall, and a new Parent Liaison, Renee Joyner, who were all "black." (*Id.* ¶¶ 374–75.) Plaintiffs claim the race-based bullying of DS resumed in eighth grade. (*Id.* ¶ 377.) On September 23, 2021, CS met with Vice Principal Wims-Hall to discuss recent attacks made on DS to try and stop the race-based bullying, and Vice Principal Wims-Hall agreed that the attacks were related to past bullying of DS. (*Id.* ¶ 381.)

On October 28, 2021, GX, a "dark-skinned" classmate, took DS's backpack and brought it into the next room where DS's Chrome book was broken.[6] (*Id.* ¶ 386.) Vice Principal Wims-Hall did not discipline GX, blamed DS for the incident, and threatened DS with Saturday detention. (*Id.* ¶ 387.) On November 2, 2021, CS requested a meeting with Principal Donko-Hanson to discuss the disparate treatment, but the request was denied. (*Id.* ¶ 395.) Several days later, CS received an email from Parent Liaison, Renee Joyner, relating to an incident where DS was falsely accused of using racially charged language towards a group of nine students. (*Id.* ¶¶ 397, 400.) Plaintiffs allege that Ms. Joyner had no knowledge of the language DS used and her email constituted race-based harassment because she was perpetuating the defamatory and inflammatory claim against DS. (*Id.* ¶ 403.) On April 29, 2022, Ms. Joyner told DS that she would testify in court that DS is a racist who calls her "'black' and 'brown' classmates 'n***er.'" (*Id.* ¶ 420.) Ms. Joyner said

---

and as a result of the decreased bullying, she had her best academic performance since coming to School #58. (*Id.* ¶¶ 372–73.)

[6] It is unclear from Plaintiffs' proposed amended complaint who broke DS's Chrome book. (*Id.* ¶ 386–87.)

this loud enough for the "black" and "brown" children nearby to hear. (*Id.*) Ms. Joyner also reported Plaintiffs to Child Protective Services ("CPS") because CS reported a spitting incident to the RCSD Chief of Staff. (*Id.* ¶ 422.)

In response to the spitting incident, DS's medical doctor, Gretchen Smith-Burke, wrote a letter to RCSD claiming that School #58 was not a safe place for DS and that she should be removed as a safety measure. (*Id.* ¶ 423.) RCSD refused to accommodate DS by removing her from the school and refused to provide DS with tutoring or remote learning. (*Id.* ¶¶ 424–426.) During eighth grade, CS requested the name of the DASA coordinator so she could file DASA complaints but received no response. (*Id.* ¶ 427.) Instead, CS filed 30 DASA reports of race-based bullying between September 2021 and December 2021, herself. (*Id.* ¶ 428.) Plaintiffs allege the race-based bullying continued despite the 30 DASA reports made by CS, and CS subsequently gave up filing DASA reports. (*Id.* ¶ 429.)

## ANALYSIS

A court "should freely give leave when justice so requires" to a party seeking to amend a pleading. *Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009) (citing Fed. R. Civ. P. 15(a)(2)) (quotations omitted). The trial court has discretion over whether to grant a party leave to amend its pleadings. *Zenith v. Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330 (1971). However, the trial court also has the discretion to deny the amendment for good reason. *Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding valid reasons to deny may be, but are not limited to: undue delay, bad faith or dilatory motive, undue prejudice, and futility); *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 55 (2d Cir. 1995) (affirming district court's denial of plaintiffs' motion to

amend where amendments were futile.). A court that refuses to grant the requested leave without giving any justification for doing so has abused its discretion and has acted "inconsistent with the spirit of the Federal Rules." *Foman*, at 182.

Plaintiffs seek to add three additional defendants: Principal Kwame Donko-Hanson, a "black" man; Assistant Principal, Nyree Wims-Hall, a "black" woman; and Parent Liaison, Renee Joyner, a "black" woman. (Pls.' Proposed Am. Compl. at 2, ECF No. 93-3.) The Amendment also asserts the existing First Amendment retaliation claim against Ms. Joyner. (*Id.* ¶ 450; Pls.' Mem. of Law at 1, Dec. 2, 2022, ECF No. 93-2.) Defendants oppose Plaintiffs' motion on the grounds that they believe the amendments (1) would result in undue prejudice and undue delay, (2) would be futile, and (3) were made in bad faith. (Defs.' Mem. of Law. at 3, Jan. 12, 2023, ECF No. 101.)

### *Undue Prejudice and Undue Delay*

When determining what constitutes prejudice, the Second Circuit has routinely held that a litigant may be prejudiced, within the meaning of Fed. R. Civ. P. 15, if a new claim would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Pasternack v. Shrader*, 863 F.3d 162, 174 (2d Cir. 2017) (quoting *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993)). The Second Circuit has further provided that "complaints of 'time, effort and money . . . expended in litigating [the] matter,' without more," do not "constitute prejudice sufficient to warrant denial of leave to amend." *Id.* (quoting *Block*, 988 F.2d at 350). In *Pasternack*,

the Second Circuit held that the denial of leave to amend was an abuse of discretion because there was only evidence of delay and added litigation expense. *Id.*

Defendants argue the addition of the new defendants would prejudice them because it would cause delay and additional litigation expense. (Defs.' Mem. of Law at 3–6, ECF No. 101.) For example, they argue that the introduction of an entirely new group of defendants would significantly delay the resolution of the current claims because of the complexity of the issues and the amount of time needed to prepare for litigation. (*Id.* at 4.) Defendants also argue that the length and cost of discovery will be needlessly extended due to the nature of Plaintiffs' "voluminous and convoluted claims." (*Id.*) Lastly, Defendants argue the present action will be burdened by further motion practice between the parties, essentially contending that there will be additional delays if Plaintiffs are granted the right to amend their complaint. (*Id.* at 5.)

Defendants' arguments are foreclosed by *Pasternack.* For Defendants to prevail, they must show that Plaintiffs have caused them delay coupled with something more. *State Teachers Retirement Bd. v. Fluor Corp.*, 654 F.3d 843, 856 (2d Cir. 1981) (holding a "[m]ere delay [ ] absent a showing of bad faith or undue prejudice, does not provide a basis . . . to deny the right to amend.") (citation omitted). In this case, Defendants have made no such showing. Their arguments can be distilled down to asserting that the delay itself should be the basis for this Court to find that Plaintiffs have caused some undue delay or undue prejudice, but the Second Circuit has made it clear that delay alone is not sufficient grounds on which to deny

a motion to amend.

Furthermore, Plaintiffs do not seek the amendments to create undue delay or impose undue prejudice on Defendants. Plaintiffs are supplementing the existing complaint based on what allegedly occurred during the 2021–2022 school year. Defendants' reliance on *Champlain Enter., Inc. v. U.S.*, 945 F. Supp. 468 (N.D.N.Y. 1996) is misplaced.[7] Therefore, the Court finds that Plaintiffs have not caused undue delay or undue prejudice by amending their complaint for the second time.

*Futility*

Next, Defendants argue that Plaintiffs' motion to amend should be denied because the proposed amendments would be futile. "The standard for denying leave to amend based on futility is the same standard for granting a motion to dismiss." *IBEW Local Union No. 58 Pension Trust Fund & Annuity Fund v. Royal Bank of Scotland Group. PLC*, 783 F.3d 383, 389 (2d Cir. 2015). Courts look at whether the allegations can plausibly give rise to an entitlement to relief when deciding whether the proposed amended pleading states a claim. *Panther Partners, Inc. v. Ikanos Comm'n, Inc.*, 681 F.3d 114, 119 (2d Cir. 2019) (holding that the court considers "all reasonable inferences in plaintiff's favor to determine whether the allegations plausibly give rise to an entitlement to relief.") (citation omitted). Proposed amendments are futile if "they would fail to cure prior deficiencies" or fail to state a claim under Fed. R. Civ. P. 12(b)(6). *Tannerite Sports, LLC v. NBC Universal News*

---

[7] In *Champlain Enter., Inc.*, the court also mentions that a "delay by itself is not a reason to deny the motion." *Id.* (citing *U.S. v. Continental Ill. Nat'l. Bank and Trust*, 889 F.2d 1248, 1254 (2d Cir. 1989)).

*Grp.*, 864 F.3d 236, 252 (2d Cir. 2017) (denying as futile a proposed amended complaint that did not contain any argument regarding how it would "cure prior deficiencies" or "pass muster under Rule 12(b)(6)") (internal quotations omitted). Defendants assert that Plaintiffs' proposed amendments with respect to Counts Two through Five are futile. The Court addresses these arguments below.

### Count One – Violation of Title VI Against RCSD & The Board of Education of the Rochester City School District ("BOE")

The Court finds the previous Decision and Order of the Honorable Elizabeth A. Wolford addressing Plaintiffs' Count One claims to be instructive on this point. (Decision and Order at 11–15, March 7, 2022, ECF No. 56 ("D&O").) The D&O found that Plaintiffs had plausibly alleged that DS's harassment was so severe, pervasive, and objectively offensive that it violated her Title VI rights. (*Id.* at 15.) Plaintiffs' sole addition to Count One is a paragraph describing the general protections afforded by Title VI. (Pls.' Proposed Am. Compl. ¶ 438, ECF No. 93-3.) Furthermore, Defendants do not assert any arguments in their opposition papers for why Plaintiffs should not be permitted to amend their complaint with respect to Count One. Accordingly, the Court grants Plaintiffs' request for leave to amend its complaint with respect to Count One.

### Section 1983 Claims with Respect to Counts Two Through Four.

Prior to addressing the proposed amendments to the remaining Counts, the Court will specifically address the § 1983 claims with respect to Counts Two through Four. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Thomas v. Roach*, 165

F. 3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma v. Tuttle*, 471 U.S. 808, 816 (1985)). Also, under § 1983, claims against individuals in their official capacity are not viable because those claims are essentially claims against the entity itself. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *Shabazz v. Coughlin*, 852 F. 2d 697, 700 (2d Cir. 1988) (concluding that in a § 1983 action, "[o]fficial capacity suits, . . . are, in all respects other than name, suits against a government entity.") (citation omitted). In her D&O, Judge Wolford held that all official capacity claims against Defendants be dismissed as duplicative because the entity, RSCD, is already a defendant in the suit. (D&O at 18–19, ECF No. 56). Based on the applicable case law and Judge Wolford's previous analysis of this same issue, the undersigned recommends that the District Court deny Plaintiffs' request to add Renee Joyner, Kwome Donko-Hanson, and Nyree Wims-Hall in their official capacities.[8] *Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 687 (2d Cir. 2005) (holding a "§ 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." (quoting *Brandon v. Holt*, 469 U.S. 464, 471–73 (1985)).

### Count Two – First Amendment Retaliation Claim

With respect to Count Two, Plaintiffs seek to assert a First Amendment retaliation claim against newly named defendant Renee Joyner. To state a claim for First Amendment retaliation, a plaintiff must plausibly allege: (1) "[she] has an

---

[8] The Court would also like to stress the importance of diligent reading of prior orders issued by the Court. Plaintiffs' proposed amended complaint not only asserted official capacity claims against the new defendants, but also failed to eliminate the official capacity claims with respect to the other defendants already addressed in Judge Wolford's D&O. To eliminate confusion in the future, the Court directs the parties to review the record to ensure compliance with prior court orders.

interest protected by the First Amendment; (2) that [the defendant's] actions were motivated by or substantially caused by [her] exercise of that right; and (3) [the] defendant's] actions effectively chilled the exercise of [her] First Amendment right." *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 710 (S.D.N.Y. 2011) (quoting *Curley v. Vill. Of Suffern*, 268 F. 3d 65, 73 (2d Cir. 2001)). In § 1983 cases, the Second Circuit has held that a First Amendment retaliation claim may be dismissed if the allegations are conclusory, or if they fail to create a causal connection. *Bordas v. Payant*, 374 F. App'x 192, 194 (2d Cir. 2010) (dismissing plaintiff-appellant's retaliation claim because his allegations were conclusory, and he failed to plausibly allege a causal connection between defendants and the alleged misconduct); *Rosendale v. Bruise*, 374 F. App'x 195, 197 (2d Cir. 2010) (summary order) (holding that plaintiff's retaliation claim failed because he did not name the individuals responsible for the misconduct that he alleged chilled his First Amendment rights). To determine whether there is a viable First Amendment retaliation claim, the court's duty is to "determine whether the complaint itself is legally sufficient." *Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). Here, Plaintiffs' proposed amended complaint meets the legally sufficient standard, as discussed below.

Defendants argue Plaintiffs have not alleged sufficient facts to show that Ms. Joyner's conduct chilled Plaintiffs' First Amendment rights. (Defs.' Resp. at 10, ECF No. 101.) Defendants also argue that Plaintiffs do not sufficiently allege that Ms. Joyner's conduct prevented Plaintiffs from exercising their ability to express their views. (*Id.*) Furthermore, Defendants assert that Plaintiffs' First Amendment claims

are barred under the municipal liability doctrine evinced in *Monell v. Dep't. of Soc. Servs. of City of N.Y.*, 436 U.S. 658 (1978)[9]. (*Id.* at 9–10.)

Here, Plaintiffs have cited multiple incidents where Ms. Joyner's actions were in response to Plaintiffs exercising their First Amendment rights, and Ms. Joyner was specifically named as being involved in those incidents. Plaintiffs allege that Ms. Joyner was one of the few individuals who reported Plaintiffs to CPS in response to Plaintiffs reporting misconduct. (Pls.' Proposed Am. Compl. ¶ 450(o), ECF No. 93-3.)[10] The alleged unfounded CPS visit is direct evidence of an adverse action taken by Ms. Joyner in response to Plaintiffs' participation in protected activities. Additionally, Ms. Joyner, in the presence of several others, is alleged to have announced that she would testify in court that DS "is a racist who calls her 'black' and 'brown' classmates 'n***er'." (*Id.* ¶ 420.) Plaintiffs also allege DS told Ms. Joyner to back away from her, and Ms. Joyner lowered her Covid-19 mask and spit in DS's face. (*Id.* ¶ 421.) Plaintiffs' allegations are not conclusory because they cite specific actions carried out by Ms. Joyner towards Plaintiffs.

In conclusion, Plaintiffs' allegations sufficiently plead that Ms. Joyner violated

---

[9] Defendants' argument is misplaced. *Monell* addresses cases where parties are added in their official capacity. Here, Plaintiffs allege Ms. Joyner violated their First Amendment rights in her individual capacity. Thus, *Monell* does not apply, and Plaintiffs only have to allege facts sufficient to plausibly meet the elements for a First Amendment retaliation claim. *Graham*, 473 U.S. at 163–68 (distinguishing official capacity suits and individual capacity suits).

[10] In Judge Wolford's D&O, the Court held that Plaintiffs sufficiently alleged a First Amendment claim against an individual capacity defendant by alleging that the defendant referred Plaintiffs to CPS in retaliation for CS's complaints about harassment and bullying. (D&O at 22, ECF No. 56) The Court further held that this occurrence, at least in part, effectively chilled CS's ability to exercise her First Amendment rights. (*Id.*)

Plaintiffs' First Amendment rights. Ms. Joyner's actions effectively chilled Plaintiffs from reporting misconduct and resulted in additional concrete harm arising from the retaliatory home visit from CPS. Therefore, Plaintiffs have alleged sufficient facts to sustain a First Amendment retaliation claim against Ms. Joyner in her individual capacity.

### Count Three – Violation of Equal Protection and Due Process

With respect to Count Three, Plaintiffs seek to add Principal Donko-Hanson, Vice Principal Wims-Hall, and Parent Liaison Joyner as official[11] and individual capacity defendants for violating Plaintiffs' Equal Protection and Due Process rights under 42 U.S.C. § 1983.

### Equal Protection

Plaintiffs claim that the newly added defendants have violated their Equal Protection rights. To properly state that claim a plaintiff must allege that "'[(1)]compared with others similarly situated, [plaintiff] was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bullock v. Gerould*, 338 F. Supp. 2d 446, 449 (W.D.N.Y. 2004) (quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004). Furthermore, in the school setting, an Equal Protection violation may arise out of a deliberate indifference to student-on-student harassment or through direct action. *Doe v. Patrick*, 437 F. Supp. 3d 160, 176 (N.D.N.Y. 2020)

---

[11] As stated above, the undersigned recommends that the District Court dismiss the official capacity claims against all defendants, new and old.

(collecting cases); *Faccio v. Eggleston*, No. 10-CV-699, 2011 WL 3666588, at *10 (N.D.N.Y. Aug. 22, 2011) ("A violation of the Equal Protection Clause by a state actor in the school setting can either be through direct action or due to deliberate indifference to student-on-student harassment.") Because the official capacity claims are unviable, the Court will analyze whether the claims against the newly added defendants in their individual capacities meet the requirements for an Equal Protection violation, and whether the proposed amended complaint has addressed any deficiencies relating to previous defendants.

Defendants assert multiple arguments for why Plaintiffs' proposed amended complaint should be denied with respect to the Equal Protection claims. First, Defendants argue that the proposed amended complaint has again failed to clearly particularize the allegations tied to each defendant.[12] (Defs.' Resp. at 10, ECF No. 101.) With respect to Defendant Kim Garlock, Plaintiffs have failed to add any new claims or attribute existing claims to her that would cure deficiencies addressed in the previous D&O, which held that the Equal Protection claim against her should be dismissed.

Second, Defendants assert a blanket argument that Plaintiffs' allegations "do not amount to plausible allegations of racially discriminatory intent against Plaintiffs

---

[12] Judge Wolford addressed this issue in her D&O. The D&O dismissed Plaintiffs' Equal Protection claims against some of the defendants. Those defendants, except for Defendant Garlock, have since been removed from Plaintiffs' proposed amended complaint. Therefore, Defendants' arguments with respect to the dismissed defendants are irrelevant. Additionally, the D&O held that Plaintiffs' amended complaint alleged enough facts against each remaining defendant, individually, to plausibly plead an Equal Protection violation against them. (D&O at 29, ECF No. 56.) This Court sees no reason to depart from the D&O with respect to the remaining defendants.

or demonstrate a clearly unreasonable deliberate indifference to known discrimination by the proposed individual defendants." (*Id.* at 11.) Notwithstanding the broadness of Defendants' argument, the Court agrees with Defendants. In *Rodriguez v. Clinton*, 357 F. App'x 355, 357 (2d Cir. 2009), this Circuit held that state actors who acquiesce in a decision was not enough to create a genuine issue of material fact with respect to plaintiff's Fourteenth Amendment claim. Similar to *Rodriguez*, Plaintiffs only assert that Principal Donko-Hanson was copied in on an email chain and a party to a requested meeting that was cancelled. (*Id.*)

Indeed, the allegations asserted against Principal Donko-Hanson are similar to those asserted against prior defendant, former Parent Liaison Boyd. (D&O at 28, ECF No. 56.) Judge Wolford found that Mr. Boyd, having been copied in on emails and denying Plaintiff CS's request for a meeting with the parents of one of DS's alleged harassers, did not plausibly plead an Equal Protection claim against Defendant Boyd. (*Id.* at 28–29.)

Plaintiffs further allege that Principal Donko-Hanson refused to write a DASA report on at least one occasion while he was Assistant Principal of School #58 regarding an incident where DS told Ms. Torregrossa about Ms. Martin's racist name calling. (Pls.' Proposed Am. Compl. ¶ 326, ECF No. 93-3.) Defendants also argue that Principal Donko-Hanson was merely the principal of School #58 and was a party to a requested meeting that was later cancelled. (*Id.* at 11–12.) Without more, the Court agrees with Defendants that Plaintiffs do not plead sufficient allegations to demonstrate intentional discriminatory conduct or clearly unreasonable deliberate

indifference to known discrimination with respect to Principal Donko-Hanson. Therefore, the Court recommends that the district court find that the addition of an Equal Protection claim against Principal Donko-Hanson to be futile and that it deny Plaintiffs' motion in this respect.

In addition, Defendants claim the allegations against Vice Principal Wims-Hall and Ms. Joyner are also insufficient to establish valid Equal Protection claims. (Defs.' Resp. at 11, ECF No. 101.) With respect to Vice Principal Wims-Hall, Plaintiffs have sufficiently plead allegations that it is plausible that he violated Plaintiffs' Equal Protection rights. For example, on October 8, 2021, GX, a "dark skinned classmate" of DS, took DS's backpack and broke her Chrome book. (Pls.' Proposed Am. Compl. ¶ 386, ECF No. 93-3.) Vice Principal Wims-Hall allegedly accused DS of allowing the incident to happen and threatened her with Saturday school detention while neglecting to punish GX. (*Id.* ¶ 387.) Also, on November 2, 2021, GX was caught with pictures of naked women on his Chrome book because DS reported it to Vice Principal Wims-Hall. (*Id.* ¶ 393.) Sometime after DS reported GX to Vice Principal Wims-Hall, GX and DS got into an altercation. (*Id.* ¶ 394.) As a result, Vice Principal Wims-Hall allegedly gave DS five days of in-school suspension but did not discipline GX. (*Id.*) The Court finds that Plaintiffs have sufficiently plead facts to support their allegations of racially discriminatory intent on the part of Vice Principal Wims-Hall. Thus, the Court grants Plaintiffs' motion to amend the complaint as to this claim against Vice Principal Wims-Hall.

The Court also finds that Plaintiffs have sufficiently plead facts to support a

violation of Plaintiffs' Equal Protection rights by Parent Liaison Joyner. On November 8, 2021, Ms. Joyner allegedly yelled at DS in front of "black" and "Hispanic" classmates for being in the hallway. (*Id.* ¶ 396.) On April 29, 2022, Plaintiffs allege that Ms. Joyner antagonized DS for her participation in the Student Leadership Counsel and said that she would testify in court that DS is a racist who calls her "black" and "brown" classmates "n***er". (*Id.* ¶ 420.) Ms. Joyner allegedly said this loud enough such that "black" and "brown" children nearby could hear. (*Id.*) Lastly, Ms. Joyner allegedly emailed Plaintiffs claiming that she had conversed with adults of children of color about DS's complaints of race-based bullying at School #58, and this subsequently led to mistreatment and bullying of DS because of her race. (*Id.* ¶ 402.) These allegations demonstrate that it is plausible Ms. Joyner intended to engage in racially discriminatory conduct with respect to Plaintiffs. Therefore, the Court grants Plaintiffs' motion to amend the complaint as to this claim against Ms. Joyner.

### *Due Process*

Plaintiffs also claim that newly added defendants Principal Donko-Hanson and Vice Principal Wims-Hall violated their Due Process rights. The determination of whether there is a Due Process violation involves a two-part analysis. First, the Court must determine whether the plaintiff has a constitutionally protected property or liberty interest. *Narumanchi v. Board of Trustees of Connecticut State University*, 850 F. 2d 70, 72 (2d Cir. 1988). Second, if there is a protected interested identified, then a court must consider "whether the government deprived the plaintiff of that interest

without due process." (*Id.*) "A liberty interest may arise from either of 'two sources –
the Due Process Clause itself [or] the laws of the States.'" *Rodriguez v. McLoughlin*,
214 F.3d 328, 337 (2d Cir. 2000), *cert. denied* 532 U.S. 1051 (2001), (quoting *Kentucky
Department of Corrections v. Thompson*, 490 U.S. 454, 460 (1989)).

Plaintiffs' proposed amended complaint alleges Defendants violated their Due
Process rights when DS was wrongfully suspended from school six times. (Pls.'
Proposed Am. Compl. ¶ 459, ECF No. 93-3.) Plaintiffs also allege that DS was
threatened with suspension on a few occasions in addition to receiving actual
suspension. (*Id.* ¶¶ 387, 392.) Previously, Judge Wolford dismissed Plaintiffs' Due
Process claims against several defendants because the allegations were plead in a
conclusory manner and Plaintiffs did not oppose the dismissal of their Due Process
claims. (D&O at 30, ECF No. 56.) Here, Plaintiffs' allegations appear to be more
particularly plead. For example, in Plaintiffs' proposed amended complaint, they
claim DS was wrongfully suspended because she was given suspension after a
student, J, punched her and DS swore in response. (Pls.' Proposed Am. Compl.
¶¶ 390–91, ECF No. 93-3.) Another alleged incident occurred between DS and
another "dark skinned" classmate, GX. According to Plaintiffs, DS defended herself
by pushing GX away because GX "pushed his body up to DS as if her was going to hit
her." (*Id.* ¶ 394.) Vice Principal Wims-Hall allegedly gave DS in-school suspension
while there were no consequences for GX. (*Id.*) Plaintiffs allege further that DS was
given wrongful suspension when she was the victim of attack and had walked away
from the attacker. (*Id.* ¶ 417.) In addition to actually receiving suspension, Vice

Principal Wims-Hall threatened DS with suspension on several occasions. (*Id.* ¶¶ 387, 392.)

In viewing the proposed amended complaint in a light most favorable to Plaintiffs, it is plausible that their Due Process rights were violated based on the newly added allegations. Several of Plaintiffs' allegations show that DS was given suspension either when she was defending herself or because she was simply involved in the specific altercation. Furthermore, Vice Principal Wims-Hall threatened to suspend DS and, based on the allegations, it appears that the only plausible reason for doing so was because of DS's race.

While there are specific allegations against Vice Principal Wims-Hall for denying Plaintiffs their Due Process rights, there is a lack of allegations against Principal Donko-Hanson. Plaintiffs' proposed amended complaint alleges that Principal Donko-Hanson violated DS's Due Process rights by suspending her six difference times. (*Id.* ¶ 459.) However, Plaintiffs failed to plead any allegations that indicate Principal Donko-Hanson was the one who gave DS suspension.[13] Plaintiffs plead that Principal Donko-Hanson deprived DS of her right to be kept safe in a scholastic environment under New York State law, but do not provide any facts supporting their conclusory statements. (*Id.* ¶ 434.)

Therefore, the Due Process allegations with respect to Vice Principal Wims-Hall are sufficiently plead and the Court grants Plaintiffs' request to amend their

---

[13] There are several allegations asserting that DS was suspended for insufficient reasons. However, it is not always clear who suspended DS.

complaint to include the alleged Due Process violations against him. However, with respect to newly added defendant Principal Donko-Hanson, the undersigned recommends that the District Court deny the addition of a claim for a violation of Due Process because there are no specific allegations that he suspended DS without affording her Due Process.

### Count Four – Municipal Liability for Failure to Train & Supervise

With respect to Count Four, Defendants argue that Plaintiffs' claim for municipal liability and failure to train and supervise arise wholly from Defendants' alleged failure to comply with DASA. (Defs.' Resp. at 12, ECF No. 101.) Defendants are correct in stating that there is no private right of action under DASA. *C.T. v. Valley Stream Union Free School District*, 201 F. Supp. 3d 307, 326–27 (E.D.N.Y. 2016) (agreeing with defendants that there is no private right of action under DASA.) Defendants also argue the DASA violation claims should be dismissed. (Defs.' Resp. at 12, ECF No. 101.) However, Defendants' argument is misplaced as Plaintiffs are not alleging that there is a private right of action under DASA. Instead, Plaintiffs rely on the DASA violations as evidence of a flaw in the RSCD and BOE policy and those entities' failures to train and supervise their employees.

Judge Wolford's D&O held that Plaintiffs' allegations were adequate when viewing the DASA violations as evidence of a failure to properly train or supervise employees. (D&O at 31, ECF No. 56.) Judge Wolford held that the DASA violations showed that the school's employees and supervisors were "deliberately indifferent" to the harassment that was taking place. (*Id.* at 32.) Not only did the DASA violations show a deliberate indifference to the race-based harassment, but they also showed

that the school's employees and supervisors were not doing anything to prevent or curtail the harassment. (*Id.*) The Court faces the same question as Judge Wolford and finds Plaintiffs' previous allegations, together with the newly added allegations in the proposed amended complaint, adequately plead municipal liability for failure to train and supervise at this stage of the litigation. Accordingly, the Court grants Plaintiffs' motion to amend with respect to Count Four.

### Count Five – Negligent Supervision/Failure to Keep Safe

With respect to Count Five, Defendants argue that Plaintiffs' allegations are insufficient to state a claim because of a group pleading deficiency. (Defs.' Resp. at 12, ECF No. 101.) However, the Court finds that Plaintiffs have provided sufficient information with respect to the additional Defendants to adequately put them on notice. Plaintiffs' proposed amended complaint routinely names the newly added Defendants and attributes specific conduct to each of them. While this Court agrees that Plaintiffs' allegations could be more artfully plead, the clarity of the allegations must only meet the low bar evinced in Rule 8's pleading standard. *Kittay v. Kornstein*, 230 F.3d 531, 541 (2d Cir. 2000) (concluding "if the court understood the allegations sufficiently to determine that they could state a claim for relief, the complaint has satisfied Rule 8."). Thus, the Court grants Plaintiffs' motion to amend their complaint with respect to Count Five.

### Bad Faith

Finally, Defendants argue Plaintiffs' amendment has been made in bad faith. A court may determine that a movant has acted in bad faith if the movant's amendment seeks to derive some tactical advantage. *Ithaca Capital Investments I*

*S.A. v. Trump Panama Hotel Management, LLC.*, 450 F. Supp. 3d 358, 376 (S.D.N.Y. 2020) (stating that a tactical advantage may be used to show the moving party acted in bad faith in addition to a showing of undue delay.); *Bryant v. Steele*, 64 F. Supp. 3d 441, 444 (E.D.N.Y. 2014) (concluding that if a party seeks leave to amend solely to gain a tactical advantage, then that would support a finding of bad faith). Defendants allege Plaintiffs were attempting to engage in "legal gamesmanship," and were not "advancing a legitimate interest" when they decided to amend their complaint. (Defs.' Resp. at 13, ECF No. 101.) They also claim that Plaintiffs sat on such allegations for approximately a year before filing the instant motion for leave to expand the scope of this lawsuit as some sort of punishment. (*Id.* at 13–14.) The Court struggles to conclude that Plaintiffs are not advancing a legitimate interest. Plaintiffs' motion to amend attempts to add a new group of defendants who allegedly violated the rights of DS and CS. Again, delay on its own is not enough to deny the movant leave to amend; there must be something more. *State Teachers Retirement Bd.*, 654 F.2d at 856 ("[m]ere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for a district court to deny the right to amend.") Defendants do not demonstrate the "something more" required for the Court to find that Plaintiffs acted in bad faith when seeking to amend their complaint.

Furthermore, the Federal Rules of Civil Procedure allow for a liberal construction of Rule 15. *Loreley Financing (Jersey) No. 3 LTD. v. Wells Fargo Securities, LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (holding the liberal standard set forth in Rule 15 "'is consistent with our strong preference for resolving disputes on

the merits.'" (citing *Williams v. Citigroup Inc.* 659 F.3d 208, 212–13 (2d Cir. 2011)).)

Ultimately, the Court has broad discretion in its decision-making process, and must

act with the interest of justice in mind. In this case, the Court believes justice affords

Plaintiffs the right to freely amend their complaint. The Court is not convinced by

Defendants' arguments that Plaintiffs are amending their complaint to unduly

burden or prejudice Defendants. Nor is the Court convinced that Plaintiffs seek to

amend their complaint in bad faith. Rather, the Court believes the complexity of the

allegations and the several years over which they occurred permits Plaintiffs to freely

amend their complaint pursuant to Rule 15(a) and the legal precedent within the

Second Circuit.

### *Individual Service On Each Newly Added Defendant*

Defendants contend that if the Court grants leave to amend the complaint,

then Plaintiffs should be required to properly serve the newly added defendants in

compliance with Rule 4. (Defs.' Resp. at 15, ECF No. 101.) Rule 4 provides:

> (1) following state law for serving a summons in an action brought in
> courts of general jurisdiction in the state where the district court is
> located or where service is made; or (2) doing any of the following: (A)
> delivering a copy of the summons and of the complaint to the individual
> personally; (B) leaving a copy of each at the individual's dwelling or
> usual place of abode with someone of suitable age and discretion who
> resides there; or (C) delivering a copy of each to an agent authorized by
> appointment or by law to receive service of process.

Fed. R. Civ. P. 4(e). The summons and complaint must be served within 90 days of

the complaint being filed. Fed. R. Civ. P. Rule 4(c)(1); 4(m). Rule 4 also provides that

an individual may be properly served with process by way of an authorized agent, but

the agent must be authorized to accept service by appointment or operation of law.

Fed. R. Civ. P. (e)(4).

Defendants argue that Plaintiffs should be required to comply with Rule 4 by personally serving each newly added defendant. (Defs.' Resp. at 16, ECF No. 101.) Defendants claim that RSCD's law department is unaware of anyone in the school with the authority to accept service as authorized agents, and no one in the Law Department is an authorized agent to accept service on behalf of any of the newly added defendants. (*Id.*) Plaintiffs propose that General Counsel Adrian Neil accept service of the amended complaint if leave were to be granted. (Goewey Decl. ¶ 25, ECF No. 93-1.) However, Defendants contend that Mr. Neil is unable to accept service because he is the head of the District's Law Department. (Defs.' Resp. at 16, ECF No 101.) Based on the forgoing, the Court finds that Plaintiffs are required to serve the newly-added Defendants in compliance with Fed. R. Civ. P. 4.

## CONCLUSION

For the reasons discussed above, the undersigned recommends that the District Court:

(1) **DISMISS** Plaintiffs' § 1983 claims against individual defendants in their official capacity;

(2) **DISMISS** the Equal Protection claim asserted against Kwame Donko-Hanson; and

(3) **DISMISS** the claim for Due Process against Kwame Donko-Hanson.

The undersigned grants Plaintiffs' leave to amend their complaint with respect to the remaining claims and additional Defendants. Finally, the undersigned directs Plaintiffs to effect personal service in accordance with Fed. R. Civ. P. 4 for each of the

newly-added Defendants. Plaintiffs are directed to file the amended complaint in compliance with this decision and order and report and recommendation.

Pursuant to 28 U.S.C. § 636(b)(1), the undersigned hereby

**ORDERS**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See, e.g., Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**<u>Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.</u>** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **<u>Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.</u>**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

DATED:    May 10, 2023
          Rochester, New York

_____
MARK W. PEDERSEN
United States Magistrate Judge